24613425111 Energy and Policy Institute versus Tennessee Valley Authority. Arguments not to exceed 15 minutes per side. Ms. Cole for Appellants. Good afternoon, Your Honors. Good afternoon. My name is Allison Cole and I represent the Appellant Energy and Policy Institute, or EPI. I would like to reserve four minutes for rebuttal. Very well. Thank you. It may please the Court. The first matter is about how TVA did not meet its burden to justify its decision to withhold records under Exemptions 4, 5, and 6 of the Freedom of Information Act. Instead, TVA stretched the terms of the exemptions and provided vague and conclusory evidence, as well as speculative statements of foreseeable harm. Ultimately, TVA should have released records related to its liability policy and details about its relationships with entities known for influencing federal policy. To begin with Exemption 4, Exemption 4 does not protect any and all information submitted to the government. The Supreme Court in Milner and this Court in cases like Brugiero have been clear that FOIA exemptions are to provide no more protection over records than what the statute dictates. Under Exemption 4's first requirement, TVA must show that material withheld is in and of itself commercial. Exemption 4 does not apply to any communications related to commercial activity. What's the difference? It can be difficult to discern the difference. But when the courts, and particularly the D.C. Circuit recently, and Crew v. Department of Justice in the summer, the Ninth Circuit, and the Center for Investigative Reporting, the courts are cabining the term commercial to its clear meaning in that it has to do with the commercial activity of the submitter. So by comparison, TVA submits that its rates are commercial. EPI does not dispute that the attorney's rates are commercial. But it also says that contents of emails that are updates relate to its commercial operation and creates a roadmap for someone else to discern their legal strategies. That is a bridge too far. And that's what the courts are saying in those circuits about keeping commercial to its clear meaning. We have a little bit of a funny circumstance here where we have the documents, like the updates that you were mentioning, are the work product of a law firm. And so this is what they sell to clients. Does that mean the product itself, because it is sold and paid for, is commercial in nature? I think it can be, Your Honor. In this instance, EPI's position is that TVA did not show that McGuire Woods or the CLG is paid for these updates, that it's sort of an ancillary part of the purpose of CLG. But even so, TVA does not prove that those were actually kept commercial or to a limited few. McGuire Woods and TVA weren't kept commercial or weren't kept confidential? Excuse me if I misspoke, confidential. Okay. And so if this court does decide that those updates are, as TVA says repeatedly, work product for exemption for purposes and therefore commercial, they've not shown that that material has been kept confidential. Well, aren't there confidentiality agreements? Yes, Your Honor, but TVA presenting confidentiality agreement that actually contemplates sharing within member organizations as needed, without any bounds. How big are the member organizations? I think PGEN, according to the briefing, has 16 members. What about GLC? Sixteen seems pretty small. Yes, Your Honor. So that is unknown, the amount of membership in the CLG, and it's EPI's position that TVA should at least attest to the amount of members in the CLG in order to claim that it is confidential information. Even when there's a confidentiality agreement. So you think if there's a confidentiality agreement but membership is large, I think the case that we have an example of is like over 2,000 members. Yes, Your Honor. So that can't be that many utilities in the United States, so it can't be that large. It can't be as large as 2,000, and the court need not line draw in this instance because the confidentiality agreement doesn't say that it's meant for a limited few or just a few members in the organization. It says they can share as needed. And TVA is a member of the CLG, and it could attest to this, and McGuire Woods could have attested to this, but it does not. It just presents this confidentiality agreement and asks the court to infer confidentiality. And under Argus Leader, this is insufficient. The agency must show that circulation was at least, they said, at least limited to a few individuals. And in that case, it wasn't a trade associated with many members. There was proof that individual companies kept this information closely guarded. It wasn't even shared between companies through this trade association in Argus Leader. So would we be looking at, for example, the number of people that the updates were sent to as opposed to the number of corporations that they were sent to? So, for example, I'm from Columbus, so we have nationwide insurance. If you send to one corporation, there could be 11,000 employees, right? Are we looking at the number of corporations it's shared with, like the number of member organizations in CLG? Are we looking to the number of names of people who would have gotten the documents? I think both of those facts are really important to tell if an agency has basically kept it private. It really is, it has been kept private. That is the core of the Supreme Court's decision in Argus Leader. And so all of those elements, I think, are important. And though there is only one example that says the circulation was so wide it could not have been kept private, that is quite large a number, I think in this case it is possible. And this question was left open by TVA for over two years and has not met its burden here. Speaking of meeting its burden, there are also just omissions and contradictions within the Vaughan Index. In Vaughan Index entries for documents 40 through 42 on page ID 833 of the record, there is a completely redacted email, but TVA states that Exemption 4 only applies to member identities and email addresses. Attachments to that email are also withheld, and TVA indicates that they concern the purpose of PGIN, Power Generators Coalition, and meeting planning, but none of these things are tied to their commercial activity or explain why that material is commercial. And so this is just one example of where TVA takes one piece of information that it purports is contained in a document and redacts it entirely. And then there are also contradictions within descriptions regarding the Climate Legal Group updates. For instance, TVA calls each update an attorney-client communication. And at the same time, TVA claims that disclosing the update would reveal business strategy. It cannot be both, so these contradictions show that TVA... Well, I mean, why not? A lawyer could give you advice about the range of activities you can engage in, and there might be some additional discussion about which one of those is most sensible from a profit standpoint. That's true, Your Honor. I can say that it was attorney-produced material. That's business advice. I think that the distinction that's relevant for what we're talking about, which is whether they have shown that this material is commercial, saying that it reveals business strategy is not describing commercial material. It's describing the outcome. And TVA consistently conflates this describing material as, in and of itself, commercial, with this idea of talking about foreseeable harm from disclosure. And those are separate parts of the analysis. Well, I mean, doesn't strategy precede the actual activity? It would kind of be the opposite. It's preceding it and it's anticipating it, and that, too, would seem to be harmful from a commercial standpoint if competitors learned about that strategy in advance. That would be harmful if the material contained strategy, but the climate legal updates do not contain strategy. How do we know that? Because that's what TVA asserts in the Vaughan Index. It says that it would reveal strategy. It doesn't say that it contains strategy. Well, what's the difference? Well, I mean, the difference is that it's tenuous. So what McGuire Woods and TVA are attesting to is that legal updates that are a few years old that describe what happened in a climate case or what's going on in regulation somehow would reveal business strategy. So is that a staleness argument, though, on your part? There's a staleness argument as to foreseeable harm. Okay, about causation, basically. You think it wasn't protected in the first instance. That's right, Your Honor. Yes, that's what I'm not tracking. I mean, strategy, look at the military context, for example. I mean, one side in a conflict would love to know the strategy, even if it's something that's incubating for a year and a half. They'd love to know that strategy in advance. That's very important to operations on the ground. Why is the business context any different? The business context isn't different if it actually is a foreseeable harm. But what is different is in FOIA, you have to do the first step first, which is prove that Exemption 4 applies under each prong, which is that it is in and of itself commercial, that it is kept confidential. Okay. And then the foreseeable harm requirement requires the agency to look at the information and ascertain if it would result in foreseeable harm. So it can fall under Exemption 4 but then fail under the foreseeable harm requirement, or it could look like this information could be damaging, especially what we're talking about here, which is what we think are business relationships that the public might have some thoughts about. Okay. Can I ask you a question about Exemption 6? So what is the public interest in the employee names and email addresses? Thank you, Your Honor. The public interest is in the, basically, identities of either the companies or the individuals, and it could just be the companies and it would fulfill a public purpose, of who's influencing the Tennessee Valley Authority, in particular as it relates to the Power Generators Coalition, because this was an entity that was created by and for TVA but with just a couple of utilities in connection with McGuire Woods. And then later there were more members recruited. You don't need to know how to contact those individuals and bombard them or have somebody... I don't know these terms, like docs and all that kind of thing. I mean, I don't see why you'd need... I mean, I understand you're briefed to be arguing you're entitled to email addresses of some of these folks, and I don't follow, or I don't understand why, I guess. Briefly, because we're in the red. Right. To that, Your Honor, if this court decides that it is not something that's fulfilling a public interest, that information is segregable. So the names of the individuals or the names of the corporations, either one, can serve EPI's interest in this case. That's true. Segregability. That's a tongue twister. Yes. All right. Thank you very much. You'll have your rebuttal. We'll hear from Ms. McCarty. Yes. Yes. Good afternoon. May it please the Court, Lane McCarty on behalf of Tennessee Valley Authority. So I'd like to start out with addressing what Ms. Cole was discussing and perhaps clarify a bit what the CLG and PGEN are. These groups are housed and operated by McGuire Woods, a law firm, and what these groups do is they, McGuire Woods provides regulatory analysis, compliance advice on rules, regulations, primarily with regard to AIR, to these industry clients who are members of these groups. And these documents reflect these services, contain these services actually, that McGuire Woods provides to these groups. Go ahead, please. While you're just clarifying the groups, am I correct that PGEN is incorporated but CLG is not? And if CLG is not, does that mean the member organizations have, like, individual retainers with McGuire Woods? Like, how is it? I know, like, Exemption 5, an attorney-client was not addressed by the district court here, but I'm a little confused about the formation of CLG and what type of entity we're looking at. Of course. So PGEN is incorporated. Yes. And it was created by, formed by McGuire Woods. A lot of the emails actually deal with the formation of CLG, its operations, essentially. PGEN. Yes, PGEN. Sorry. The CLG is, was not incorporated, and it actually started at another law firm at Hunton, and it was moved to McGuire Woods when these attorneys moved. And it is, I do not know the exact nature of the relationship, whether there's retainer agreements, but as Mr. Jabbar describes in his declaration, it is, the CLG is the client. So it is members, almost like a trade association. It is, McGuire Woods is providing advice to these, to the CLG, and the CLG, McGuire Woods views them as their client for those purposes because they're industry groups that have an aligned interest, primarily air, environmental laws. So they're receiving, it's a forum in which these groups can receive this analysis guidance on these regulations that they cannot supply themselves. Are they, is CLG a legal entity, or is it just sort of an unincorporated association maybe? I do not know the answer to that. You don't know if it's a legal entity? I mean, your briefing is pretty clear that PGEN is a C6, right, and that the other thing is a client group. The wording in your briefing. Okay, all right. Thanks for clarifying. I'm going to disrupt your flow, but I do have a question, and I'm a little bit on the fees issue now. Okay. So in the fees opinion, the district court said the defendant released, that's you, most of the documents in response to new, most in response to new representations by McGuire Woods regarding its exemptions. Does most mean all? Are there some lingering out there that are not covered? And which ones? There was a total of 369 documents withheld as part of this FOIA request. About, well, it was four months after the amended complaint was filed, which first complaint dealt with just the McGuire Woods. Second complaint added the EGIS information. Four months after the complaint was filed, there was a draft bond index being prepared, and that is when McGuire Woods re-reviewed essentially all of the withheld documents, and there was a number of documents that McGuire Woods withdrew its FOIA exemption for objections to. I believe it was 176 of them. Most of those documents were attachments to the CLG email updates. So the CLG updates consisted of attorney analysis of regulations, policies within the interest of these groups, and a lot of the time if a particular policy was being discussed or regulation, the email would include that as an attachment. So that was essentially a publicly available document, and McGuire Woods reviewed those, determined that it was not going to assert an exemption for objection over those documents, and those were released. So that's primarily what the vast majority of documents released were. Of that 176, most of them are attachments? Is that what you're telling me? Correct. Well, that's a voluntary or unilateral change on McGuire Woods' part, isn't it? On McGuire Woods' part. So that would satisfy the statute for a prevailing party to that extent, wouldn't it? And TVA's position is that has to be a voluntary and unilateral change on TVA's, on the agency, because per the terms of the statute it says the agency must change its position. And here TVA's regulations require it to consult with the submitter, who is McGuire Woods in this instance, and it's the submitter who has really the best knowledge about what this information is because it's their information. So TVA reviews what the submitter has said, the objection, and if it's reasonable and in good faith, TVA says that. But you're making a judgment there. Like just because McGuire Woods says I want to withdraw my objection, if you thought that it still wasn't releasable under FOIA, you wouldn't just do whatever they told you to do, right? Correct. That's true. So then how is it not a voluntary? I mean, it's not involuntary because McGuire Woods asks you to do it. It's TVA considering McGuire Woods' objection. But TVA still makes the call, right? Like at the outside if McGuire Woods says, hey, we don't think that these should go to EPI, like you see the document too, right? And you can say, no, this doesn't fall under Exemption 4, this does or doesn't fall under 6, et cetera. Correct, and even with that, TVA's position is that if you look at the attorney's fee statute, it still qualifies that by saying the complainant's claim is not substantial or is insubstantial. It's poor form, I agree, but not insubstantial. And these are all mostly publicly available documents. Well, okay, but setting aside the not insubstantial part, it does seem that there's a voluntary or unilateral change in position by the agency. I mean, the agency, as we just discussed, is making a decision that, okay, what McGuire Woods is telling us is something that comports with the statute and we're going to go forward. And if reasonable interpretation, and if that's so, TVA's position would be it does not entitle EPI to $150,000 in attorney's fees because it was early in the lawsuit, prior to motion practice. It's essentially the give and take of how FOIA . . . That's the entitlement question, not the eligibility question, right? And the district court, that's not something we should determine in the first place. TVA does not think this court needs to reach that, no. So if we thought that they were eligible but not necessarily entitled, we would remand.  Can I ask about a non-fee issue? Oh, sure. We talked with your friend on the other side a little bit about the confidentiality element of the updates, the CLG updates. I wonder if you would be willing to address that. So confidentiality, a key part of Exemption 4, the starting point for confidentiality is Argus Leader, which the Supreme Court delineated essentially two steps for when a document is confidential. It's when the person imparting the information treats the information as confidential, and then particularly when the person receiving the information provides some assurance. The government provides assurance. The government. It says when the person. And here, that is the government. It's also CLG and PGIN in this situation because they also receive some of the information. The statute says person, so going with that. But Argus Leader and the cases on it tell us that the standard is somewhat closely held for that first prong that you were talking about, right? Is this actually something that is closely held? How do we know if it's closely held if we have no idea how many people it goes to? Well, PGIN has 16 members. We don't know how many people it went to in PGIN. You have Mr. Jabbar's declaration. It doesn't give us any sense of numbers. He did not give numbers, but neither does Argus Leader. It gives a substantive showing made by the submitter and the agency or the person receiving the information. It did not delineate a bright-line test of numbers. And even if it did, in this situation, I can represent to the court that the CLG has eight members, or it did at the time of this information. PGIN had 16. But you have Mr. Jabbar's declaration describing how the information is. Clients are advised not to disseminate it, that it is marked confidential attorney-client privilege on the documents. In the Vaughn Index, it lists how the documents are marked attorney-client privilege, confidential. And you also have the confidentiality provisions of the PGIN articles of incorporation as well as the CLG bylaws. And then you also have the government declaration, Ms. Gillen, where she testified that the information received in the context of the CLG emails as well as PGIN was treated confidentially and TVA also expected that the other members of the group were treated confidentially, which provides the two necessary prongs from our just leader. If you just told us how many people are in CLG, why was that information withheld for so long? Was there foreseeable harm? I mean, do you have to get to a court of appeals to get that information? It was not asked. We did a Vaughn Index, and we described what the CLG was, and it was just not contained in the declaration. I have a minor question, but I feel like there are so many minor questions because there are so many documents. The AEGIS representative on the insurance policy, there's like a lingering detail, right? I don't know whether you still want to withhold that name. It's not in your brief. I don't know which exemption you want to withhold it under. Maybe you don't care. They raise it, so. I believe it was withheld under Exemption 4, and I believe what was in the Gaffney Declaration was that the person negotiating the insurance and signing it on behalf of TVA was confidential commercial information. Why? The submitter said it was confidential commercial information, which could be because the person negotiating the insurance with specific companies is protected information by AEGIS. What is the harm with more of the policy information getting out? If I understand, is there a competitor even that this is going to go to and be used by to somehow disadvantage? Yes, Your Honor. So AEGIS is part of a number of large insurance companies that offer insurance coverage to entities like TVA. And these policies, when they're being negotiated, there are specific coverage determinations, premium assessments of how much premium to charge for certain exclusions, how the liability is assessed that is proprietary to AEGIS and that each policy is different. And AEGIS does, that is essentially its business, it's using another term, business strategy of how it sells insurance to entities such as TVA. And the harm in that getting out is other insurance companies could utilize that without developing their own strategy. And other potential insurers or insureds could get that information and negotiate, well, you gave TVA this, we should get this. It's the con, which is what's revealing. So just sharing price information is, I mean, that's protected? It's not just pricing, it's what they decide to exclude, what they decide to include in these conditions. For instance, wildfire, are we insuring, you know, how are we insuring that? It all goes to the prices, though. I mean, it's unusual to say, okay, we're going to suppress information that would normally be part of the price signal in a free market economy. I think pricing information is traditionally...  I mean, maybe in this context there's a different answer. And I do know they seek protective orders when these policies are produced in litigation. Yeah, that's a quite different question. That's a real low bar. That's generally not relevant at all in context other than behave yourselves during discovery. But that's okay. Can I ask one more? Yeah, go ahead. Just because your friend on the other side called it out in the briefing, document 85, the e-room notifications, what is the basis for calling these commercial or confidential? It's how... And I think it's PGIN maybe uses that. It's either PGIN or the CLG. How that group communicates with its members and the processes for how they disperse information. It's a password-protected proprietary site that McGuire Woods uses to communicate with their... So, like, knowing they used Zoom would be commercial information? It could be in this context. And the foreseeable harm for people knowing that you use Zoom or the e-room or whatever to talk. So there's other law firms that create these groups that have formed these industry groups. So there is a competitive market for these groups and how they're operated, how they convey information to their members. And that... You still say, I want to go to the other law firm because, like, they use Zoom and the other people use Microsoft Teams? I mean, I'm just trying to... It seems like a very weird, like, how, like the, you know, it's... I mean, I think your friends, you know, on the other side called it out because it does seem a little bit of a stretch. A fair point. I also am not aware what the entirety of what was in the document right now just standing before the court today, but... All right, we got that cleared up? Yeah, totally clear now. All right. Time is up. Court has any more questions? We do not. Thank you. Appreciate your argument. We will hear rebuttal. Thank you, Your Honors. I just wanted to address a few things brought up by opposing counsel regarding the AGIS liability policy. Again, it's about TVA not meeting its burden here. It has to connect what it's claiming would reveal underwriting policy to what the actual material is being withheld. So some of the material that's being withheld, presumably, are a list of facilities covered by the liability policy. This does not reveal anything about AGIS' proprietary underwriting process. And so there are portions of this policy that are likely segregable from other portions that are commercial and then qualify under the other prongs of Exemption 4. And regarding this policy, there is a public concern, there's a public interest in knowing how well-protected or not-protected communities are that are around these facilities. I just wanted to take a moment to recognize that. Regarding the fees issue, opposing counsel stated that McGuire Woods decided that the material was public documents in the initial release, which was over 150 attachments. There's nothing about these documents that weren't apparently public documents in the first instance. These were attachments that went with climate legal group updates that were updates about climate cases filed. But ergo what? Ergo, if TVA had examined the attachments, they would have released them after our initial request. And instead, it stood by these redactions during administrative appeal and stood by the redactions. And they only reexamined these redactions during negotiations when EPI asked them to look at these attachments. But you got them. We did get them, but TVA is claiming that that wasn't a volunteer release by the agency, that it was a McGuire Woods decision, and therefore EPI does not qualify for fees under the eligibility prong. And so I just wanted to clarify that. I don't know how much they're still claiming that. Understood. And then regarding the confidentiality argument, McGuire Woods provides the portion of the confidentiality agreement, so your honors can see for yourself how this is left open for internal sharing within companies. And actually, Argus Leader, the court stated that the declarations did say with specificity how closely held that the records were within companies. These are SNAP benefits. This was commercial data down to the store level that could directly be used by competitors to open these stores and compete. And regarding the issue of entitlement, EPI agrees that entitlement can be determined at the court below, and it has actually provided enough for this court, though, to find that these requests were in the public interest, that EPI does not have a commercial interest in these documents, and at least to some claims, TVA's position was unreasonable. And that includes the attorney-client privilege claims that were dropped only when it became clear through a court order that the court was very skeptical of these arguments, but EPI had to litigate these issues. Regarding the remedy, although there are many issues and many prongs to these exemptions, we think that it can be dealt with simply. We ask that the court remand this case because TVA did not meet its burden of proof and because TVA's claims of foreseeable harm are purely speculative. On remand, we ask this court to instruct the district court to apply Exemption 4 using the correct meaning of the term commercial and to review whether TVA met its burden for showing confidentiality based on the facts actually in the record, not on inferences. We ask that this court direct the district court to conduct the Exemption 6 balancing inquiry, considering specific information at issue, as well as EPI's stated interest in the records. I'm just going to come back to one thing. I feel like I asked you with respect to Exemption 6, with respect to the balancing, what is your interest. I didn't really get much of an answer, so if you'd like to give me one. It seemed like you kind of said, well, it could be segregable. Yes, Your Honor. I apologize for that for not being more clear. EPI's interest is in the special relationships that TVA has with other members of the utility industry and even McGuire Woods. Uncovering relationships between government entities and private parties are one of these bedrock uses of FOIA. There are numerous cases that show that this is a really good and core use of FOIA in ensuring transparency. Why do you need to be able to contact the individual members? You need their email addresses. They're the employees of these companies. Yes, Your Honor. We do not need to contact them. We just want to know the relationships. And courts have found that actually. You argued in your brief, if I recall, that you're entitled to email. Emails, direct phone numbers. Why do you need that? Cell phone numbers. EPI argues that TVA did not meet its burden in showing that there is more than de minimis privacy interest in these email addresses that are business emails. Of course it is. I mean, who doesn't have a privacy interest in not being contacted by people you don't want to be contacted by? That can be a privacy interest if there is some indication that that could occur. And that is the burden that's on TVA. I think anyone with a phone knows that that could occur. But I'm not going to belabor it. But phone numbers are no longer at issue, right? Yes, Your Honor. That is a distinction, too. So part of TVA's brief, they highlight information that is not actually requested by EPI. EPI in its footnote, its opening brief, said what it was requesting. And the district court also uses cell phone numbers as an example. EPI does not seek cell phone numbers. Okay. Well, that's a good clarification. And the other use in other cases, too, the other use of email addresses for follow-up FOIA requests. This has been a valid public interest. Okay. Well, we're out of time here. So thank you for your argument. The case will be submitted.